Filed 6/10/13  P. v. Nabong CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br><br>v.<br><br>JIMMY NABONG,<br><br>            Defendant and Appellant. | A132451<br><br>(San Mateo County<br>Super. Ct. No. SC068634B) |

On the evening of October 29, 2008, Shivnesh Reddy was robbed and shot to death during a marijuana sale.  Appellant Jimmy Nabong was charged with the killing and convicted by jury of robbery (Pen. Code, §§ 211, 212.5, subd. (c))[1] and first degree murder under a felony-murder theory (§§ 187, subd. (a), 190.2, subd. (a)(17)(A)).  Nabong was sentenced to an indeterminate term of 50 years-to-life in prison, plus a concurrent term of 3 years, plus 25 years to life for the robbery.

On appeal, Nabong contends the trial court erred in:  (1) admitting evidence of his gang affiliation; (2) sustaining a defense witness's invocation of the Fifth Amendment privilege against self-incrimination; and (3) refusing to compel the prosecution to grant immunity to the witness.  He argues that the errors should be assessed cumulatively.  He also contends that the prison term imposed on the robbery count must be stayed pursuant to section 654.  We modify the judgment to stay the sentence on the robbery count, but otherwise affirm.

_____

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Nabong was charged, by information, with Reddy's murder (§ 187, subd. (a); count one) and robbery (§§ 211, 212.5, subd. (c); count two.) As to both counts, the information further alleged that Nabong personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). In conjunction with count one, it was alleged that Nabong personally and intentionally inflicted great bodily injury (§ 1203.075) and that he committed felony murder because the killing was during the commission of robbery (§ 190.2, subd. (a)(17)(A)).[2]

*The Prosecution's Evidence*

### Kristal Talatoa's Testimony

In October 2008, Kristal Talatoa lived on 1st Lane in South San Francisco. She knew Reddy from the neighborhood. On the night Reddy was killed, Talatoa was outside her apartment when she observed Reddy walking with a white plastic bag in his hand. Reddy placed the bag under a car. Reddy greeted Talatoa and told her he was "pulling a sale"—meaning he was going to sell marijuana. Talatoa overheard Reddy receive a telephone call and say that he was in the alley. Soon thereafter, a black or dark green car arrived. Reddy retrieved the plastic bag and got into the backseat, behind the passenger. The car drove away. Talatoa testified that three other men were in the car.[3]

When the car returned, Reddy opened the rear door and stuck his leg out. Talatoa observed Reddy conversing with the driver and the individual in the front passenger seat.

---

[2] Codefendant Neil Chand was also charged in the information but entered a guilty plea before trial. As we discuss *post*, Chand testified against Nabong at trial.

[3] Talatoa originally told police there were two other people in the car. On cross-examination, Talatoa said that, when the car first arrived, she saw only two people in it. However, when the car returned, Talatoa saw three people in addition to Reddy. The third man was behind the driver and wore a hood.

2

Reddy put up his hands. When his hands came back down, Talatoa heard a gunshot and saw the flash from a fired gun in the front passenger seat.[4] Reddy fell out of the car.

After the car left, Talatoa called 911 and told Reddy an ambulance was on its way. Reddy was unable to speak.

Jesus Barrigo's Testimony

On the evening of October 29, 2008, Jesus Barrigo looked out the window of his home, on 1st Lane, in South San Francisco. Barrigo saw a black Honda Accord that had been parked for half an hour without anyone exiting the vehicle. The Honda was partially blocking his neighbor's driveway. Barrigo went outside where his car was parked directly behind the Honda. Barrigo noticed that two men were in the car, and they were smoking. One of the men had curly shoulder-length hair. Barrigo thought something suspicious was going on and wrote the Honda's license plate number (4LKS032) in the dirt on the rear windshield of his car. About 30 minutes later, the Honda was gone and Barrigo saw a young man, who had been shot, lying in the middle of the street.

Police Investigation

A few hours later, South San Francisco police officers located the car that Barrigo had identified, a black Honda, parked near a gas station at the Westborough Shopping Center. Neil Chand's mother was listed as the registered owner. Chand, who had been sitting in the car, was arrested. No live rounds or spent casings were found in the car.

Autopsy and Firearms Evidence

An autopsy was conducted. The cause of Reddy's death was a single gunshot wound to the chest. A projectile was recovered and released to police. It was determined to be a bullet from a .380 automatic handgun.

---

[4] On cross-examination, Talatoa said that she did not see a gun in anyone's hands. However, she did see the front passenger turn in Reddy's direction, "[a]nd that's how [she saw] the light coming from [the gun.]" The driver also turned his head toward the back seat and then toward the front of the car.

3

## Fingerprint Evidence

A criminalist with the San Mateo County Sheriff's Office processed Chand's car for fingerprints. Nabong's fingerprints matched prints lifted from the front passenger safety belt and passenger side mirror. Fingerprints lifted from the rear passenger doorframe matched Murad Aimen Zawaideh and John Darin LaPierre.[5]

## Chand's Testimony

Chand testified that he was originally charged with Reddy's murder and was facing a potential sentence of life without the possibility of parole. Chand pleaded guilty to murder in exchange for a sentence of 25 years to life. The sentence was contingent upon Chand testifying truthfully at Nabong's trial.[6]

Chand had known Reddy since middle school. They saw each other regularly and smoked marijuana together. Both Reddy and Chand sold marijuana. Chand also admitted that he had participated in 10–15 robberies against drug dealers. A gun was always involved in these robberies, but Chand never carried the gun and sometimes was not present during the actual robbery. In the fall of 2008, Chand was "constantly" under the influence of marijuana. He smoked half an ounce a day.[7]

The night before the murder, Reddy told Chand he had 15 pounds of marijuana to sell. Chand agreed to find a buyer but decided to rob Reddy instead. Chand planned to commit the robbery with Zawaideh, with whom he had committed approximately 5–10 armed robberies in the past. Chand was going to set up the deal with Reddy. Then, Zawaideh would have the gun and commit the robbery without Chand present. Chand would receive "a cut."

---

[5] The fingerprint examiner testified on cross-examination that it was impossible to tell when the prints were deposited.

[6] On cross-examination, Chand said he understood that he had to tell the truth in order to get the benefit of the deal. Chand also understood the prosecution's theory was that Nabong was the shooter.

[7] Chand had prior convictions for misdemeanor embezzlement and possession of marijuana.

4

On the afternoon of October 29, 2008, Chand went to the shop where Reddy worked as a car mechanic. Chand, Reddy, and another acquaintance discussed the price and details of the transaction. They then drove to 1st Lane, where Reddy produced an ounce of marijuana. Chand smoked some as a sample. Reddy took the remainder of the marijuana back to the apartment where he obtained it and the three men drove back to the garage. Chand called Zawaideh and said that the deal was set. Chand drove to an apartment complex, in South San Francisco, to meet Zawaideh. Chand was under the influence of marijuana.

Zawaideh got into Chand's vehicle, where they discussed the planned robbery. Zawaideh stated that he could not commit the actual robbery because Reddy would recognize him. Zawaideh suggested that LaPierre could assist. This was fine with Chand, as Chand had previously committed a robbery with LaPierre, in which LaPierre had been armed.

A few hours later, Chand and Zawaideh met with Nabong and LaPierre. Nabong was with LaPierre, in LaPierre's car, which was a green GTO. Chand had not previously met Nabong, who introduced himself only as "Anthony." LaPierre said he would drive his car and Nabong would commit the robbery. LaPierre stated that they would take the marijuana from Reddy and, if Reddy resisted, they would "rough him up." Nabong showed Chand a stack of money to be used.

Chand, Zawaideh, Nabong, and LaPierre drove to a nearby McDonalds to eat. After they left McDonalds, Chand called Reddy and told him "the deal was on" with LaPierre and "Anthony."[8] Reddy said he did not feel comfortable doing a drug deal with two people he did not know, but would feel comfortable if Chand accompanied them. Chand agreed. Chand drove his black Honda to a spot close to where the robbery was planned. LaPierre, Zawaideh, and Nabong rode in LaPierre's green GTO. Chand was on

---

[8] On cross-examination, Chand said that he drove the three others to McDonalds in his Honda. Zawaideh sat in front, and LaPierre and Nabong sat in the back. Nabong never sat in the front seat, either on the way to or from McDonalds.

probation, subject to a search condition, and did not want a gun in his car. Nonetheless, after LaPierre suggested that Nabong and Chand commit the robbery, Chand agreed to the revised plan. Chand was going to drive his Honda, while Nabong committed the robbery, with Nabong's gun. Nabong and Chand planned to make it appear that Chand was also the victim of a robbery.

Chand and Nabong drove to South San Francisco and parked on 1st Lane, where they waited 20 to 30 minutes for Reddy. Nabong showed Chand the gun, which was a chrome-colored, automatic weapon. Nabong said it was a .380. Nabong then put it in his waistband. Chand noted that Nabong had a tattoo of four dots on his hand. This indicated, to Chand, that Nabong was a Norteño gang member. Chand asked Nabong where he was from. Nabong said he was a Norteño from 3rd Street in San Francisco.

Eventually Reddy arrived and called Chand. Chand met Reddy and told him to get in the car. Reddy got into the rear seat with a white bag of marijuana. Chand was in the driver's seat. Nabong was in the front passenger seat. Chand drove around the block. Nabong showed Reddy a stack of money. Reddy gave Nabong the bag of marijuana to examine.

Chand stopped the car in the same spot where he had previously picked up Reddy. Nabong had the marijuana and the money. Reddy asked for the money. Nabong said: " 'This is my weed and get the fuck out of the car.' " Nabong pulled out a gun and pointed it at Reddy's chest. Reddy replied: "I'm not getting out of the car. You're gonna have to shoot me." Nabong paused and then shot Reddy in the chest. Reddy fell out of the car. Chand drove away.

Chand drove his car to the end of the block. After looking for something by the front of his foot, Nabong exited the car with the money, and got into LaPierre's car. Chand drove to a South San Francisco parking lot, where he searched his car for the shell casing or other evidence. He found nothing.[9]

---

[9] On cross-examination, Chand denied ever handling or disposing of the gun.

Chand then called Chris Husary. Husary and an acquaintance picked up Chand. They smoked more marijuana.[10]

Chand spoke to LaPierre and Zaweideh on the phone. Zaweideh told Chand to erase everything on his phone. LaPierre said they should burn Chand's car. Several hours later, Chand retrieved his car and drove to a gas station. The police arrived and arrested Chand.

Chand made a number of statements to the police over the next several days, in which he lied. He was scared and wanted to avoid responsibility. In the end, Chand identified Nabong, LaPierre, and Zawaideh as having been involved in the robbery.[11] Although Chand did not feel responsible for Reddy's death, at trial he felt shame and regret.

Nabong is Taken Into Custody

On November 2, 2008, Nabong was taken into custody. He was originally placed in juvenile hall and was transferred to county jail on his 18th birthday. The police took possession of Nabong's cell phone and gave him *Miranda* warnings.[12] When interviewed by police, Nabong denied being in South San Francisco on the night of Reddy's murder. He also denied being with LaPierre that night. A San Mateo County correctional officer, working in the intake classification office, testified that Nabong had gang tattoos. When asked about the tattoos, Nabong said that he was an active Norteño, from the Mission district.

---

[10] Chand testified on cross-examination that he told Husary and the acquaintance that "this drug deal went all bad." There was no further discussion. Chand specifically denied telling Husary that someone had been shot. Husary gave Chand a ride home. As we discuss in detail *post*, Husary was subpoenaed to testify by the defense, and invoked his Fifth Amendment privilege.

[11] On cross-examination, Chand revealed that he initially named LaPierre as the shooter. Chand said this identification was false. He had hoped that LaPierre would identify Nabong.

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

<u>Vanessa Martinez's Testimony</u>

Nabong's then girlfriend, Vanessa Martinez, testified that, in October 2008, Nabong was staying with her in Daly City. Martinez was aware that Nabong was a Norteño gang member and that he lived on Sunnydale Avenue in San Francisco. On October 29, 2008, Martinez overheard Nabong talking on the telephone with LaPierre. She heard the word "lick," which is slang for robbery. Martinez knew LaPierre, but did not trust him. After Nabong hung up, she confronted him. Nabong said LaPierre wanted him to come along to do a robbery. She asked Nabong not to go, and he agreed that he would not. Martinez fell asleep and Nabong left without telling her.

Later that night, Nabong returned with LaPierre and Zawaideh. When Martinez greeted Nabong, he told her to leave the room. After the two men left, Martinez spoke with Nabong. Nabong told Martinez that he, someone named "Neil," LaPierre, and Zawaideh had planned "a lick." LaPierre and Zawaideh stayed in another car while Chand and Nabong committed the robbery. Nabong said that the victim got in the car, threw the marijuana to Nabong, then Nabong pulled out a gun and told the victim to get out of the car.[13] The victim refused to get out of the car and Nabong saw him reach for something. Nabong was scared and shot him. Nabong said he was in the front passenger seat and the victim was in the back. Nabong also told Martinez he was going to split the proceeds from the robbery with Neil, Zawaideh, and LaPierre.

After the shooting, Nabong got rid of his cell phone and purchased a new phone. Martinez agreed to delete gang photos and photos of Nabong with guns from Nabong's old cell phone. Martinez and Nabong also sent messages back and forth about the robbery. In one, Nabong said: "Why I have 2 fuck things up[?]" Martinez told Nabong:

---

[13] Martinez initially testified that Nabong told her: "That the guy got in the car and that he threw him the weed and then [LaPierre] pulled out a gun and told him to get out, but he didn't want to get out. And then he seemed to be reaching for something so he got scared." However, then she testified that Nabong told her he had a gun and that, after the victim threw him the weed, "[h]e pulled it out and told him . . . to get out of the car. [¶] . . . [¶] Then [Nabong] seen like the victim reaching for something. So he got scared and then he just shot."

8

"You didn't fuck shyt up u were just getn hela crazy about licks nd dats wat happens." She meant that Nabong was being greedy about robberies.

When Martinez learned that LaPierre was in custody, she told Nabong she would lie to the police and say Nabong was with her all night. Accordingly, at first, she told police the agreed story. She lied to protect Nabong and because she was frightened about her own involvement. Eventually, the police confronted Martinez with text messages indicating that she knew about the robbery and told her that they wanted her to tell the truth.[14] Martinez then told the police that four men were involved in a robbery gone bad. Ultimately, Martinez told police that Nabong did not plan the shooting but shot the victim in self-defense.

When Martinez was called to testify at the preliminary hearing, Martinez was frightened and cried. She originally testified that Nabong was with her all night. But after speaking to counsel, invoking her Fifth Amendment privilege, and being granted use immunity by the prosecutor for her earlier testimony, Martinez testified that Nabong admitted being the shooter.

Cell Phone Evidence

A cellular telephone evidence examiner, testified that he reviewed records of Nabong's two cell phones and of the cell phones belonging to Martinez, Reddy, LaPierre, Chand, Zawaideh, and LaPierre's girlfriend. The contract for Nabong's old phone was terminated two days after the murder, on the same day the new phone number was activated.

---

[14] Martinez was on probation at the time and subject to a probation condition that she not use cell phones. On cross-examination, Martinez testified that the police told her if she did not give a statement, she could go to jail. But, if she gave them information they thought was correct, the police would tell her probation officer she was cooperative. Martinez thought she had to cooperate with police because she was on probation and was afraid of being taken to jail. The police told her what they thought had happened—that Nabong was involved in a robbery and not with her that night. At first, she said that Nabong never told her who the shooter was. He just said there was a robbery and someone got shot when it looked like he was reaching for a weapon.

9

On October 29, 2008, at 3:00 p.m., Nabong's old phone sent the following text to LaPierre: "Sup wit da lil lick." Fifty-seven minutes before the homicide, Nabong's old phone sent the following message to LaPierre: "Ma nigga we should take da money n the weed." LaPierre's phone responded: "rob da driver bra." Nabong's phone texted back: "Fasho." LaPierre also texted, "Take da earings" and "Dnt shot nobody niga 4 real."[15] Also, on the day of the homicide, Nabong texted an unknown party: "A ma nigga Im tryna sell dis lil 380 I got."

*Defense Evidence*

Laurie Kaminski, a forensic scientist, testified as an expert on gunshot residue. She examined Chand's Honda. Gunshot residue was located on the driver's seat, passenger seat, and rear seat. Kaminski said that she could not determine from where a gun was fired. She opined that if the gun was discharged inside the vehicle, gunshot residue could be within the entire interior of the car. Gunshot residue was also on Chand's face and hands. The positive result indicated that Chand either fired a gun, was in close proximity to a gun that was fired, or touched surfaces contaminated with gunshot residue.

*Verdict and Sentence*

The jury found Nabong guilty on both counts. It also found the enhancement and special circumstance allegations true. The trial court exercised its discretion to decline, due to Nabong's age at the time of the offense, the standard penalty of life without the possibility of parole. (§§ 190.2, subd. (a), 190.5, subd. (b).) Instead, the trial court sentenced Nabong to a term of 25 years to life on count one, plus a consecutive term of 25 years to life for the firearm enhancement. With respect to count two, the trial court imposed a concurrent term of 3 years, plus a concurrent term of 25 years to life for the firearm enhancement. Nabong filed a timely notice of appeal.

---

[15] Chand was wearing expensive earrings that night.

## II. DISCUSSION

On appeal, Nabong contends: (1) the trial court abused its discretion by admitting evidence of his gang affiliation; (2) the trial court erred in sustaining a defense witness's invocation of the Fifth Amendment privilege against self-incrimination; (3) the trial court erred by refusing to compel the prosecution to grant immunity to the witness; (4) the errors should be assessed cumulatively; and (5) that the prison term imposed on count two must be stayed pursuant to section 654. Only Nabong's final argument has merit.

### A. *Gang Evidence*

First, Nabong contends that the firearm use and special circumstance findings must be reversed because the trial court abused its discretion in admitting prejudicial evidence of his gang affiliation, over his relevance and Evidence Code section 352 objections. He asserts that admission of the evidence resulted in a fundamentally unfair trial.

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Italics added.)

" '[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [Citation.]' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "The court's exercise of that discretion will not be disturbed on appeal unless the prejudicial effect of the evidence clearly outweighs its probative value. [Citations.]"

11

(*People v. D'Arcy* (2010) 48 Cal.4th 257, 298.)  "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.  [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)

In assessing prejudice, we must remember that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues . . . .' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

1. *Background*

Before trial, the trial court ruled, over Nabong's objection, that evidence of Nabong's gang tattoos and gang affiliation could be admitted to explain Chand's identification of Nabong and to explain Chand's reluctance to name Nabong as the shooter.  In addition to Chand's testimony, the prosecutor proposed to call a classification officer from the county jail who photographed Nabong's tattoos.  The photographs would be introduced and the classification officer would also testify that Nabong said, when asked about his gang membership, that he was an active Norteño.  Nabong's trial counsel objected to the proffered testimony from the officer, on the ground the evidence was more prejudicial than probative.  (See Evid. Code, § 352.)  Specifically, he asserted:  "If Chand is identifying Nabong by virtue of, A, his tattoos and, B, his statement that, 'I'm a Norteno,' and then that becomes why he claims to be afraid of him, the fact of the matter is [Nabong] has those tattoos.  They can be shown to the jury during the proceedings of the trial.  But his gang membership or that he admitted he was in a gang is overly prejudicial and doesn't add anything."

The prosecutor responded:  "[Chand is] going to say I saw the tattoos on [Nabong's] hand which I described to the police, the dots.  And of course the jury will

require some explanation as to why anybody would pay attention to what looked like four little dots. Otherwise it's not a terrible [*sic*] credible version of events. [¶] And second of all [Chand's] going to say and [Nabong] told me he was a Norteno and that's one of the reasons I didn't want to identify him as the shooter, because I was afraid of retaliation even if they arrested him from other Nortenos. The issue is if I am not permitted to prove that independently why should the jury believe [Chand] based on four little dots. [¶] And the fact that [Nabong] freely admitted it to somebody else does tend to corroborate that he would tell [Chand] that. . . . [I]t's a way of demonstrating that he wasn't shy about his membership. It avoids all of the other stuff that I've already talked about which I perceive to be the problem which is proving other crimes and . . . who he associates with and stuff like that. All of which, by the way, I have available. . . . But what we're trying to do is find common ground on the cleanest way to prove what I have to prove." The trial court ruled that the classification officer's testimony was admissible.

During his opening statement, the prosecutor told the jury: "And one of the reasons [Chand] can identify [Nabong] outside of the fact that he was sitting with him for a very long period of time is he could see the Norteno dots on his hand. There are gang tattoos which are relatively distinctive. And, yeah, [Nabong's] got his dots. He's earned his dots in the Norteno gang. He has another tattoo which is a gang-related tattoo. He has some other tattoos that [Chand] saw and will identify for you which are not necessarily gang-related. But it's clear we got the right guy."

2.      *Analysis*

Contrary to the People's characterization, Nabong does not maintain that the prosecutor committed misconduct in arguing the gang evidence to the jury. Instead, he asserts that the trial court abused its discretion in admitting the gang evidence over his Evidence Code section 352 objection. Specifically, Nabong contends: "[T]his type of gang evidence in a non-gang [enhancement] case was highly prejudicial as well as being of no or de minimis probative value, and deprived [Nabong] of a fundamentally fair trial." (Italics omitted.) Although Nabong did not raise his constitutional argument at trial, he may argue that the asserted abuse of discretion had the additional legal

13

consequence of violating due process.  (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

"But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."  (*Id.* at p. 439.)

" 'Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.'  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)  With exceptions not applicable here, 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.'  (Evid. Code, § 1101, subd. (a).)"  (*People v. Memory* (2010) 182 Cal.App.4th 835, 859, parallel citation omitted.)

Despite Nabong's assertion to the contrary, the fact that this is not a case involving a gang enhancement is not determinative of the relevance issue.  Our Supreme Court has explained:  "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.  (E.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905.)  But evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. (See, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 178 [element of fear]; *People v. Williams* (1997) 16 Cal.4th 153, 193 [motive and identity]; *People v. Champion* (1995) 9 Cal.4th 879, 922–923 [identity].)"  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049, parallel citations omitted.)  "Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury.  [Citations.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224 (*Albarran*).)

In arguing that the trial court abused its discretion, Nabong relies on *Albarran*, *supra,* 149 Cal.App.4th 214, in which two men shot at a house during a party. There was substantial evidence that the defendant was a gang member but no evidence as to the identity of the other shooter. (*Id.* at pp. 217–219.) The *Albarran* court decided the trial court had not properly admitted gang evidence, including photographs of tattoos, threatening gang graffiti, and evidence of numerous other gang crimes, to show motive or intent, over the defendant's Evidence Code section 352 objection. The evidence was highly prejudicial and largely irrelevant because no gang enhancement was involved and no indication the defendant's crimes were gang motivated. (*Id.* at pp. 219, 220–222, 227.) The court went on to assume that, even if evidence of the defendant's gang membership had some relevance, "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia . . . was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of [the defendant]'s actual guilt." (*Id.* at pp. 227–228.)

Here, however, the limited gang evidence was not wholly irrelevant except to show criminal disposition.[16] Our Supreme Court has said that "evidence is relevant if it 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent or motive.' [Citation.]" (*People v. Champion, supra,* 9 Cal.4th at p. 922.) The limited gang evidence in this case was relevant to prove identity and Chand's reluctance to identify Nabong as the shooter. With respect to identity, Nabong concedes that evidence of his gang tattoo was relevant because it enabled Chand to identify Nabong. The identity evidence was highly relevant, given than Nabong had

---

[16] The additional authority cited by Nabong is distinguishable for similar reasons. (See, e.g., *People v. Memory, supra,* 182 Cal.App.4th 835 [extensive gang evidence admitted, including evidence of crimes committed by other members, with no relevance other than disposition to commit crimes]; *People v. Cardenas, supra,* 31 Cal.3d at pp. 904–905 [gang evidence was cumulative]; *People v. Avitia* (2005) 127 Cal.App.4th 185, 187 [gang graffiti evidence found in defendant's bedroom was unrelated to any issue at trial].)

15

originally denied being in South San Francisco on October 29, 2008, and that he was identified only as "Anthony" to Chand. Ultimately Nabong conceded that he was present at the time of the robbery. However, Nabong did not make this concession until closing argument, after all of the prosecution's evidence had been introduced. Nabong's concession does not lessen the probative value of the evidence with regard to identity. (See *People v. Leach* (1975) 15 Cal.3d 419, 444; *People v. Nible* (1988) 200 Cal.App.3d 838, 847–848.)

Nabong asserts that Chand's testimony regarding Nabong's self-identification as a Norteño was irrelevant. Nabong overlooks the fact that Chand did not simply testify that Nabong identified himself as a Norteño. Rather, according to Chand, Nabong said that he was a Norteño from 3rd Street in San Francisco. Thus, this evidence had an additional tendency to suggest that Nabong was, in fact, "Anthony."

Chand's credibility was also a key issue in this case. " ' "[E]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" ' [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 924–925.) A witness's fear of gang retaliation may be relevant to his or her credibility. (*People v. Ayala* (2000) 23 Cal.4th 225, 276–277 [trial court did not err in allowing sanitized references to unnamed groups that might wish to influence witness's testimony]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168–1169 (*Samaniego*).)

In *Samaniego*, the prosecution's gang expert testified that the defendants were gang members and that gang members often retaliate against "snitches." (*Samaniego, supra,* 172 Cal.App.4th at p. 1161.) The reviewing court did not address an Evidence Code section 352 challenge, but rather a jury instruction challenge to CALCRIM No. 1403, which limits the purposes for which gang evidence may be considered. In rejecting the claim that the instruction improperly allowed the jury to consider such evidence for credibility purposes, the court began by observing: "Gang evidence is . . .

16

relevant on the issue of a witness's credibility. [Citations.]" (*Samaniego*, at p. 1168.) Because "[a]t trial, several witnesses testified differently than at the preliminary hearing or in prior statements given to police[,] . . . [t]he disparities in the witnesses' testimony justified use of gang evidence to provide a plausible explanation for them." (*Id.* at p. 1169.)

Here, Chand did not specifically testify that he was initially reluctant to name Nabong, as the shooter, because of Nabong's gang membership. However, Chand did testify that he was scared and that he was worried about getting killed. The defense extensively cross-examined Chand on his previous statements to police and claimed, during closing argument, that Chand was not credible. Nabong's continued attempt, on appeal, to discredit Chand only emphasizes the probative value of the gang evidence. And, as Nabong himself recognizes in his reply brief, the trial court's assessment of witness credibility can play no role in Evidence Code section 352 balancing. Such an assessment is for the jury. (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998.) The gang evidence was limited and it was not inflammatory. There was no evidence of criminal gang activity by Nabong or other Norteños. We cannot say that the trial court's admission of the evidence exceeded the bounds of its discretion.

B.      *Fifth Amendment Privilege and Judicial Immunity*

Next, Nabong insists that the trial court erred, and deprived him of his right to present a defense, by allowing Husary to invoke his privilege against self-incrimination and by denying Nabong's motion for judicial immunity.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." On the other hand, "[t]he state and federal Constitutions guarantee the defendant a meaningful opportunity to present a defense. [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 456.) Nevertheless, " '[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified . . . .' [Citation.] Those rights do not entitle the defendant to compel a witness to waive his Fifth Amendment privilege. [Citation.]" (*People v. Woods* (2004) 120 Cal.App.4th 929, 938.)

17

In California, the decision of whether to grant immunity is statutorily reserved to the executive branch. (§ 1324.) Most recently, our Supreme Court summarized: "[W]e have expressed reservations concerning claims that trial courts possess inherent authority to grant immunity [citation], and even assuming the court possesses such authority, it has been recognized only when the defense has made a showing that a defense witness should be afforded immunity in order to provide clearly exculpatory testimony." (*People v. Williams* (2008) 43 Cal.4th 584, 622–623, italics omitted.) Our Supreme Court also recognized that there is "federal authority that characterizes as a due process violation a prosecutor's refusal to grant immunity to a defense witness when the refusal was undertaken 'with the deliberate intention of distorting the fact-finding process.' [Citations.]" (*Id.* at p. 624.)

Our Supreme Court previously emphasized that it was " 'doubtful' " that the trial court has inherent authority to grant immunity. (*People v. Stewart* (2004) 33 Cal.4th 425, 468 (*Stewart*).) Nonetheless, our Supreme Court also "acknowledged . . . that it was 'possible to hypothesize cases' in which 'a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial.' [Citation.] We reviewed 'the one case which has clearly recognized' such authority—[*Government of Virgin Islands v. Smith* (3d. Cir. 1980) 615 F.2d 964 (*Smith*)]—and highlighted two ' "clearly limited" ' circumstances (both articulated in *Smith*) in which judicially conferred use immunity might be constitutionally necessary. [Citation.] [¶] The first of the two tests . . . would recognize the authority of a trial court to confer immunity upon a witness when each of the following three elements is met: (1) ' "the proffered testimony [is] clearly exculpatory; [(2)] the testimony [is] essential; and [(3)] there [is] no strong governmental interest[] which countervail[s] against a grant of immunity." ' [Citations.] [¶] . . . [¶] The second of the two tests . . . would recognize such authority when 'the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence,' thereby distorting the judicial factfinding process. [Citations.]" (*Stewart,* at pp. 468–470, fn. omitted.)

18

1.    *Background*

Husary had been subpoenaed to testify by the defense.  The possibility that he would invoke the Fifth Amendment was discussed by counsel, outside the presence of the jurors, during a break in the prosecutor's direct examination of Chand.  Husary appeared with counsel and was sworn.  The following colloquy occurred on the record:

"[DEFENSE COUNSEL]:  Q.  Mr. Husary, my intent was to ask you questions about your contact with [Chand] on the night of October [29th,] 2008.  Do you understand the area that I wanted to ask you about?

"A.  Yes, I guess.  Sure.

"(Sotto Voce discussion between Mr. Husary and [his counsel].)

"[HUSARY]:  Yes.

"[DEFENSE COUNSEL]:  Q.  Okay.  Specifically, I wanted to ask you about anything [Chand] said to you while he was in a vehicle you were in, . . . on that date.  Do you understand that's the subject I want to ask you about?

"A.  Yes.

"Q.  Okay.  Now it's my understanding through your attorney that you do not wish to answer any questions about the subject?

"A.  Yes.

"Q.  And why is that?

"A.  Because it may incriminate me.

"Q.  In what way?

"[PROSECUTOR]:  I'm sorry, Your Honor. . . . [Y]ou can't ask that.

"[HUSARY'S COUNSEL]:  I object to that.

"[PROSECUTOR]:  Actually, it is not my place to enter that objection, so I withdraw it. [¶] . . . [¶]

"THE COURT:  The witness' counsel objects.  I think that's correct.  If you want to ask him a couple of direct factual questions so the record can be clear.

19

"[DEFENSE COUNSEL]:  Okay. [¶] Q.  On the evening of October 29th, 2008 did you with others go pick up . . . [¶] . . . [¶] [Chand] at a location in South San Francisco near the South San Francisco courthouse? [¶] . . . [¶]

"A.  I refuse to answer.

"Q.  Okay.  During the course of that contact with [Chand] did [Chand] discuss a shooting that had happened and something that had gone bad during a drug deal?

"A.  I refuse to answer based that it might incriminate me.

"THE COURT:  Counsel, . . . without asking you the details do you believe there is an appropriate basis for a Fifth Amendment claim here?

"[HUSARY'S COUNSEL]:  I do, Your Honor.

"THE COURT:  Based on the information provided you by your client?

"[HUSARY'S COUNSEL]:  Correct.  And on information I have received from the parties.

"THE COURT:  All right. . . .

"[DEFENSE COUNSEL]:  No further questions.

"[PROSECUTOR]:  Nothing.  Thank you, Your Honor.

"THE COURT:  All right.  And where does that leave us, then . . . ?

"[DEFENSE COUNSEL]:  Well, I think that leaves us to argue my motion [seeking an order granting immunity to Husary]."  In that motion, Nabong contended that California trial courts have the authority, in certain circumstances, to grant use immunity without the consent of the prosecutor.[17]  Nabong argued that Husary's testimony would be relevant to impeach Chand's testimony as to who had the gun and who was the shooter.

Husary was interviewed by police within a week of the shooting.  The interview transcript is included in the record, as a court exhibit.  In that interview, Husary told

---

[17] "Use immunity protects a witness only against the actual use of his compelled testimony, as well as the use of evidence derived therefrom.  Transactional immunity protects the witness against all later prosecutions relating to matters about which he testifies.  [Citations.]"  (*People v. Hunter* (1989) 49 Cal.3d 957, 973, fn. 4.)

20

police that, on the night of October 29, 2008, at around 9:00 p.m., Chand called for a ride, saying he was "stranded." Husary drove Chand home after learning of the robbery and shooting. Specifically, Chand told Husary: "[I]t's all bad, some guy got shot." Chand also told Husary: "I tossed [the gun]." Husary told police: "I was like dude, you shouldn't have done it. . . . [Chand] was like man, I know, I know, I regret it, I regret it." Husary also told police: "I told [Chand], . . . if you did something . . . [¶] . . . [¶] you shouldn't have shot nobody. . . . [Y]ou can't turn back from that, you know? . . . [¶] . . . [¶] And [Chand] was just like, I know, I know . . . ." Husary also overheard Chand talking on the phone, saying that his car was "done for." Husary was asked: "Was it your impression when you left that [Chand] was the shooter?" Husary responded: "Maybe." Then, Husary was asked: "Or is it somebody else?" Husary replied: "I couldn't tell you, man. I don't know the full story."

The People opposed the motion, arguing that there was no authority for judicial immunity. In the alternative, the People argued that a witness's tendency to impeach a prosecution witness was an insufficient basis to justify a grant of judicial immunity. During argument on the motion, Nabong's trial counsel asserted that due process required a grant of immunity because Chand's plea bargain was equivalent to a grant of immunity. The prosecutor also stated: "It has been represented to me by counsel that the basis of the Fifth Amendment claim was that [Husary] lied to the police that he was under the influence of marijuana and frightened by a situation and made up some stuff. Well, that being said that begs the question so what was his involvement in this case. [¶] [Chand] has now indicated he did a number of other robberies. The first person he calls after the shooting is [Husary] to give him a ride. We have no idea what we are immunizing [Husary] for. . . . [I]n return for some unknown testimony we're basically buying a pig in a poke."

Nabong's motion was denied. The court explained: "[T]he existing state of California law I think is clear that the discretion, the power to consider a grant or request [of] immunity is with the People. I don't see any authority to the contrary[.] [¶] . . . [¶] . . . Further, the spirit of the Ninth Circuit cases both seem to concede it goes to

21

fairness argument. . . . But here, I don't think you can equate [Chand's] situation to a granting of immunity or granting immunity to several witnesses. [¶] [Chand] has entered a plea to 25 to life. That's a long ways in my view from the prosecution granting wide use of immunity to strengthen their case. [Chand] has received some minimal consideration for his cooperation. I don't think that creates a problem of fairness in the spirit of the federal cases."

Later in the trial, Nabong's trial counsel renewed his immunity motion, arguing that "a further basis" was Martinez's grant of use immunity at the preliminary hearing. The prosecutor responded: "[N]o one was granted immunity at this trial. It is true that at preliminary hearing . . . [¶] . . . [Martinez] began the preliminary hearing . . . by again asserting that [Nabong] was with her the night of the shooting. That testimony was very brief before she became unable to continue. [¶] . . . [¶] Everybody kind of calmed her down and she . . . came back out basically [and] began again. And the grant of immunity was for what she had said up until that point. It did not immunize her for any of the conduct that was otherwise involved in the case . . . ." The trial court denied the renewed motion. It explained: "I don't think the federal cases are on point as I talked about previously. It does change a factual point, I suppose, that [Martinez] has received what I would consider immunity in this case, even though it's not this proceeding. But nonetheless, the ruling will stand for the reasons indicated previously."

2.     *Privilege Analysis*

First, Nabong contends that the trial court erred, and deprived him of his right to present a defense, in sustaining Husary's invocation of the Fifth Amendment privilege. Specifically, Nabong suggests that the privilege was unavailable because: (1) Husary did not make a sufficient showing that the privilege was validly invoked; and/or (2) Husary forfeited the privilege by speaking to police. We assume, without deciding, that

Nabong's trial counsel preserved these objections.[18]  Nonetheless, we are not persuaded by either argument.

" '[T]o be found unavailable on [privilege grounds] a witness must not only intend to assert the privilege, but also be entitled to assert it.'  [Citation.]"  (*People v. Seijas* (2005) 36 Cal.4th 291, 303 (*Seijas*).)  Evidence Code section 404 provides:  "Whenever the proffered evidence is claimed to be privileged under Section 940, *the person claiming the privilege has the burden* of showing that the proffered evidence might tend to incriminate him; and *the proffered evidence is inadmissible unless it clearly appears* to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege."  (Italics added.)  A trial court must permit a witness to exercise his or her Fifth Amendment privilege if there is any possibility the witness's testimony could serve as a link in a chain of evidence tending to establish guilt of a crime, regardless of the likelihood of prosecution.  (*People v. Williams, supra,* 43 Cal.4th at p. 614; *Seijas,* at p. 305.)  In other words, the question is "whether [the witness] had reasonable cause to apprehend danger from the testimony."  (*Seijas,* at p. 306, italics omitted.)  We independently review a trial court's finding that a witness was entitled to assert the privilege against self-incrimination.  (*Id.* at p. 304.)

Nabong argues that the trial court erred because Husary forfeited any Fifth Amendment privilege after he voluntarily spoke to police without asserting the privilege. "Given the broad protective scope of the privilege, waiver of a nonparty witness's privilege 'is not to be lightly inferred.'  [Citations.] [¶] . . . [¶] A nonparty witness may elect to waive his or her privilege against self-incrimination.  In addition, in some instances a waiver may be implied when a witness has made a partial disclosure of incriminating facts.  'It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.  [Citation.]  The privilege is waived for the matters to

---

[18] Accordingly, we do not consider Nabong's contention that, if the issue was not preserved for appeal, his trial counsel provided ineffective assistance of counsel.

23

which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination." [Citation.]' [Citations.]" (*People v. Williams, supra,* 43 Cal.4th at pp. 614–615.) However, "a witness's failure to invoke the privilege against self-incrimination during one hearing within a proceeding does not necessarily constitute a waiver for the purpose of subsequent hearings. Thus the failure of a witness to claim the privilege at a preliminary hearing does not prevent the witness from refusing to testify regarding the same incriminating material at the trial. [Citations.]" (*Id.* at p. 615; accord, *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1547; *Seijas, supra,* 36 Cal.4th at p. 303.)

Nabong has cited no authority supporting the position that a nonparty witness interviewed by police, without *Miranda* warnings and who is free to leave at any time, must invoke the Fifth Amendment privilege or else suffer a forfeiture of the privilege. The cases he cites are not on point. (See *Minnesota v. Murphy* (1984) 465 U.S. 420, 427–428 [ordinarily, " 'if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not "compelled" him to incriminate himself' "]; *Garner v. United States* (1976) 424 U.S. 648, 665 [privilege forfeited when taxpayer disclosed incriminating information on tax return, which he was required to file, rather than invoking privilege]; *Lefkowitz v. Turley* (1973) 414 U.S. 70, 84–85 [State cannot compel waiver of privilege and grand jury testimony under threat of loss of government contracts]; *United States v. Kordel* (1970) 397 U.S. 1, 9–10 [unrepresented witness who, without appreciation of the possible consequences, answered interrogatories on behalf of a corporation, was "in no position to complain now that he was compelled to give testimony against himself" due to his failure at any time to assert the privilege]; *Harrison v. United States* (1968) 392 U.S. 219, 222 ["defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives"]; *Rogers v. United States* (1951) 340 U.S. 367, 371 [witness forfeited privilege by refusing to answer questions midway through testimony before grand jury]; *United States v. Cranley* (7th Cir. 2003) 350 F.3d 617, 622 [witness required to appear before Bureau of Alcohol, Tobacco and Firearms "could decide whether it would be better for

him to confess or to take the Fifth" and, having confessed, could "not now be heard to complain of the consequences"]; *United States v. Capaldo* (2d Cir. 1968) 402 F.2d 821, 824 [Fifth Amendment privilege forfeited by grand jury witness's testimony given after he was advised of right to remain silent]; *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 425 [regarding "whether or not he is entitled to claim the privilege, it must be decided if he is being compelled to give testimony and whether he has been asked to incriminate himself"]; *Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1042 ["privilege extends to a person appearing only as a witness in any kind of proceeding where testimony can be compelled"].)  Opinions are not authority for propositions not considered.  (*People v. Partida, supra,* 37 Cal.4th at p. 438, fn. 4.)

Next, Nabong asserts:  "[T]he trial court was not permitted to dismiss [Husary] as a witness merely on his attorney's say-so that there was some unstated basis for the privilege, and was required to make a particularized inquiry as to whether a claim of privilege is well-founded."  Nabong appears to be arguing that Husary should have been compelled, over his counsel's objection, to answer the question posed regarding the basis for the invoked privilege.  However, the law does not support Nabong's view.

"The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination.  It is for the court to say whether his silence is justified, [citation], and to require him to answer 'if it clearly appears to the court that he is mistaken.'  [Citation.] However, *if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee.* To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question *or an explanation of why it cannot be answered* might be dangerous because injurious disclosure could result." (*Hoffman v. United States* (1951) 341 U.S. 479, 486–487, italics added; accord, *Blackburn v. Superior Court, supra,* 21 Cal.App.4th at pp. 428–429; *Warford v. Medeiros, supra,* 160 Cal.App.3d at p. 1045.)

25

"The substance and scope of the particularized inquiry will, of course, vary with the circumstances peculiar to the cases in which it must be made. Although for this reason it is impossible to devise an exhaustive list of the matters that should be within the scope of the inquiry or upon which the inquiry should turn, those that will often be pertinent include: 1) the nature of the information sought to be disclosed, 2) implications derived from the question asked, 3) the nature and verifiability of any investigation or proceeding claimed to justify the fear of incrimination, or the possibility that any such investigation or proceeding may be commenced, 4) matters disclosed by counsel in argument on the claim of privilege, and 5) evidence previously admitted. [Citation.]" (*Warford v. Medeiros, supra,* 160 Cal.App.3d at p. 1045, fn. 8.)

Here, the trial court was in the midst of a robbery and murder trial. The questions posed by Nabong's counsel (as well as Husary's police interview transcript) implied that Chand and Husary were together, on October 29, 2008—the night of the robbery and shooting. The record also suggests that Husary may have driven Chand home after learning of the robbery and shooting, and after Chand abandoned the car and gun involved in the crimes. Under these circumstances, the trial court could infer that further questioning of Husary could have provided a link in the chain of evidence tending to incriminate him as an accessory after the fact. (§ 32.)[19] Because it does not clearly appear that Husary's testimony could not possibly tend to incriminate him, we conclude that the trial court did not err in permitting Husary to assert the privilege.

We need not reach a different result because Nabong asserts, for the first time on appeal, that the privilege was unavailable due to the running of the statute of limitations. "If the testimony relate[s] to criminal acts long since past, and against the prosecution of which the statute of limitations has run . . . the amendment does not apply." (*Hale v.*

---

[19] Section 32 provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

26

*Henkel* (1906) 201 U.S. 43, 67; accord, *Blackburn v. Superior Court, supra,* 21 Cal.App.4th at p. 428.)  Nabong relies on one portion of the prosecutor's statement of the basis for the privilege claim and points out that obstructing the police is a misdemeanor, subject to a one-year statute of limitation.  (See §§ 148, subd. (a), 148.5, subd. (a); § 802, subd. (a) [prosecution for misdemeanor offense must be commenced within one year].)  He contends that the statute of limitations for this misdemeanor would have run by the time of trial in 2011.  Nabong ignores that a conviction for a felony violation of section 32 would not be barred by the statute of limitations.  (See § 33; § 801 [prosecution for felony offense must be commenced within three years].)  Nabong has shown no error.

> 3. *Judicial Immunity Analysis*

Nabong also challenges the trial court's ruling on his motion for judicial immunity.  He contends that fairness concerns compelled an order of judicial immunity because the prosecution granted immunity to one prosecution witness, entered into a plea bargain with another, but declined immunity to Husary.

In several instances, our Supreme Court has proceeded by assuming, without deciding, that inherent judicial authority exists to grant immunity and then analyzing the facts of the case to determine if the requisite test could be met.  (*People v. Samuels* (2005) 36 Cal.4th 96, 127–128; *Stewart, supra,* 33 Cal.4th at p. 468; *People v. Lucas, supra,* 12 Cal.4th at p. 461; *In re Williams* (1994) 7 Cal.4th 572, 609–610; *People v. Cudjo* (1993) 6 Cal.4th 585, 619; *People v. Hunter, supra,* 49 Cal.3d at p. 975.)  We will follow our Supreme Court's approach and assume, without deciding, that the trial court had authority to grant judicial immunity.  Nabong focuses on the more relaxed articulation of the test for judicial immunity as announced by the federal Ninth Circuit Court of Appeals, in *United States v. Straub* (9th Cir. 2008) 538 F.3d 1147 (*Straub*) and in *United States v. Westerdahl* (9th Cir. 1991) 945 F.2d 1083 (*Westerdahl*).

In *Straub, supra,* 538 F.3d 1147, the defendant was convicted of drug crimes and armed robbery, in large part on the basis of testimony from an associate who testified in exchange for use immunity.  Ten of 11 other prosecution witnesses had been granted use

immunity or some other substantial incentive to testify.  The associate testified that he participated with the defendant in the attempted robbery, and that the defendant was the shooter.  At trial, the defense attorney expressed his intent to impeach the associate with a prior inconsistent statement.  Specifically, he hoped to present the testimony of Mike Baumann, who purportedly heard the associate admit, around the relevant time, that he himself had just shot a man.  Baumann, however, had invoked his Fifth Amendment privilege and the trial court denied a request for judicial immunity.  (*Id.* at pp. 1148–1150, 1153.)

The defendant claimed, on appeal, that the district court violated his due process rights by refusing to compel use immunity.  The Ninth Circuit Court of Appeals reviewed the question de novo.  (*Straub, supra,* 538 F.3d at pp. 1148, 1156.)  It stated the applicable test as follows:  " '[T]he prosecution's refusal to grant use immunity to a defense witness denies the defendant a fair trial only when (1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the *deliberate intention* of distorting the fact-finding process. . . . To demonstrate the prosecutorial misconduct of the second prong, [the defendant] must show that the prosecution *intentionally* caused a defense witness to invoke the Fifth Amendment right against self-incrimination, *or* that the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness.' [Citation.]" (*Straub, supra,* 583 F.3d at p. 1156.)  In other words, the effect of distorting the fact-finding process is sufficient; one need not necessarily prove an intent to distort the fact-finding process.  (*Id.* at pp. 1157–1160.)  The court reasoned:  "Even where the government has not denied a defense witness immunity for the very purpose of distorting the fact-finding process, the government may have stacked the deck against the defendant in a way that has severely distorted the fact-finding process at trial. [Citation.]  In those cases where the government has liberally used its discretion to grant immunity to numerous witnesses, and the defendant's witness could offer relevant testimony that would directly contradict that of an immunized government

28

witness, the trial may become so fundamentally unfair that the defendant's due process rights are implicated." (*Id.* at p. 1160.)

Ultimately, the court concluded that the district court erred and remanded the case for further proceedings in the trial court. (*Straub, supra,* 538 F.3d at pp. 1164–1166.) In doing so, it commented: "The Fifth Amendment does not create a general right for a defendant to demand use immunity for a co-defendant, and the courts must be extremely hesitant to intrude on the Executive's discretion to decide whom to prosecute. [Citation.] Nevertheless, *in exceptional cases*, the fact-finding process may be so distorted through the prosecution's decisions to grant immunity to its own witness while denying immunity to a witness with directly contradictory testimony that the defendant's due process right to a fair trial is violated. At Straub's trial, eleven prosecution witnesses, many of them serious drug offenders, were granted substantial incentives or immunity to testify against him. The testimony of one such witness was crucial to the prosecution's case for armed robbery. The defense proffered one witness who could directly contradict a statement made by the prosecution's key witness, and if believed, would allow the jury to find that the prosecution's witness was a perjurer and possibly the actual perpetrator of the shooting for which the defendant was charged. That one witness was denied immunity, despite the prosecution's insistence that he was not worth prosecuting. Even absent evidence of prosecutorial intent to do so, this course of events denied Straub a fair trial." (*Id.* at p. 1166, italics added.)

*Westerdahl* was a robbery case, in which two prosecution witnesses testified against the defendant, pursuant to immunity agreements with the government. A third testified as part of a plea bargain whereby 15 pending charges were dismissed. (*Westerdahl, supra,* 945 F.2d at pp. 1084, 1085.) However, a request for immunity for a defense witness was denied, by both the government and the trial court. The defense witness, who refused to testify based on the Fifth Amendment, had purportedly previously told another defense witness that the defendant did not commit the robbery. (*Id.* at p. 1085.)

On appeal, the defendant argued that the district court's refusal to grant judicial immunity violated his due process right to a fair trial. (*Westerdahl, supra,* 945 F.2d at p. 1086.) The Ninth Circuit reversed because the trial court failed to conduct an evidentiary hearing, reasoning as follows: "Here, the government's case relied heavily on circumstantial evidence provided by the testimony of two witnesses who had been granted use immunity by the government, and one witness who testified as part of a plea bargain in which a host of felony charges pending against him were dropped. The use of this testimony, while effectively denying Westerdahl the right to contradict it with [the defense witness's] testimony, may have distorted the fact-finding process, and an evidentiary hearing should have been held to determine whether the denial of use immunity for [the witness] denied Westerdahl his due process rights. [¶] Previously, we noted in dicta that where two eyewitnesses tell conflicting stories, and only the witness testifying for the government is granted immunity, the defendant would be denied 'any semblance of a fair trial.' [Citation.] The same situation is effectively presented here. . . . For the government to grant immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness, is the type of fact-finding distortion we intended to prevent . . . ." (*Id.* at p. 1087.)

This is not an "exceptional case," like *Straub* or *Westerdahl.* Nabong focuses on the most lenient portion of the *Straub* test, under which he must show that: (1) Husary's testimony was relevant; (2) the prosecution granted immunity to a government witness but denied immunity to a defense witness who would have directly contradicted the government witness; and (3) the fact-finding process was thereby distorted such that the defendant was denied his due process right to a fundamentally fair trial. (*Straub, supra,* 538 F.3d at pp. 1156, 1162.) "[W]e are not bound by the decisions of the lower federal courts, even on federal questions. [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.) But, even assuming that we find *Straub* persuasive, Nabong cannot satisfy even that test. The transcript of Husary's police interview does suggest that Chand made implied admissions contradicting his later testimony that Nabong was the

30

shooter. And, Husary's testimony may have directly contradicted Chand's testimony regarding his disposal of the gun and Chand's statement that he did not remember telling Husary that someone got shot. Even though there is some question regarding whether Husary would testify consistently with his statements to police, we will assume that the testimony to be offered by Husary was relevant (*Straub,* at p. 1162) and " ' "clearly exculpatory." ' " (*Stewart, supra,* 33 Cal.4th at p. 469.) However, Nabong has not met his burden of establishing either that the prosecution refused to grant Husary immunity "with the deliberate intention of distorting the factfinding process" (*id.* at p. 471), or that the prosecution's refusal, in effect, constituted a fundamental distortion of the factfinding process that denied Nabong his right to a fundamentally fair trial.[20] (*Straub,* at p. 1162.)

First, Nabong points to nothing in the record that suggests that Husary's decison to assert his privilege against self-incrimination was prompted in any way by the prosecution or that the prosecutor denied Husary immunity with the intent to thereby distort the factfinding process. And, this case is unlike *Straub* and *Westerdahl* in that the People did not rely extensively on immunized testimony in presenting their case. The prosecutor only granted limited immunity to one prosecution witness at the preliminary hearing. And, Nabong is misguided in his attempt to draw an analogy between immunity and Chand's plea bargain. In *Westerdahl*, the People presented the testimony of two immunized witnesses and one witness who, by virtue of a plea bargain, was promised that 15 pending charges would be entirely dropped in exchange for his testimony. (*Westerdahl, supra*, 945 F.2d at pp. 1085, 1087.) Here, assuming that the trial court determined Chand testified truthfully, he avoided a sentence of life without parole but still would serve an indeterminate term of 25 years to life. Such a plea bargain is hardly analogous to a grant of immunity. This case is, in fact, more similar to *Stewart*, in which

---

[20] The first *Stewart* test is not satisfied because strong governmental interests justify denial of immunity in this case. (*Stewart, supra,* 33 Cal.4th at p. 469.) Given Husary's possible culpability as an accessory, the prosecution clearly had good reason to want to retain an unburdened ability to prosecute him. If Husary had been granted immunity, and later prosecuted, the People would have been forced to prove that any evidence used was not derived from the testimony at Nabong's trial. (*Id.* at p. 470.)

our Supreme Court distinguished *Westerdahl* on the ground that the prosecution's grant of very limited use immunity to two prosecution witnesses did not constitute heavy reliance on immunized testimony. (*Stewart, supra,* 33 Cal.4th at pp. 436, 438, 471.)

Accordingly, the trial court did not err in denying Nabong's motion to grant judicial immunity.

C.      *Cumulative Error*

Nabong argues that the cumulative effect of the alleged errors requires reversal of the judgment. We have rejected Nabong's arguments on the merits. Nabong was entitled to a trial "in which his guilt or innocence was fairly adjudicated." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) He received such a trial.

D.      *Section 654*

Nabong argues, and the People concede, that the court erred in not staying sentence on the robbery count, pursuant to section 654, because the robbery was the same act that made the killing first degree murder. We agree.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." Under section 654, double punishment for the commission of a single act is proscribed even though such act violates two or more sections of the Penal Code. (*People v. Smith* (1950) 36 Cal.2d 444, 448.) "The prohibition against double punishment found in . . . section 654 [also] applies where a course of conduct which violates more than one statute comprises an indivisible transaction. The divisibility of the transaction depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for only one offense. [Citation.]" (*People v. Bailey* (1974) 38 Cal.App.3d 693, 701; accord, *People v. Latimer* (1993) 5 Cal.4th 1203, 1208–1209, 1216.) "It is well settled . . . that the court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a

sentence under section 654. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.) Thus, we can correct any section 654 error regardless of whether Nabong raised a section 654 objection at sentencing. (*People v. Hester* (2000) 22 Cal.4th 290, 295; *People v. Scott,* at p. 354, fn. 17.)

In felony-murder cases, section 654 prohibits imposition of a separate sentence for robbery, when it is also the underlying felony in the crime of felony murder. (*People v. Meredith* (1981) 29 Cal.3d 682, 695–696; *People v. Boyd* (1990) 222 Cal.App.3d 541, 575–576; *People v. Conrad* (1973) 31 Cal.App.3d 308, 333; *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547.) Because Nabong's robbery conviction rested on the same conduct underlying the felony murder, for which the trial court also imposed sentence, it was required to stay imposition of sentence on Nabong's robbery conviction.

## III. DISPOSITION

The judgment is modified to stay the sentence for robbery (count two), pursuant to section 654. In all other respects, the judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

_____
Bruiniers, J.

We concur:

_____
Jones, P. J.

_____
Simons, J.

33