**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRENT ROGER WILKES,
*Defendant-Appellant*.

No. 11-50152

D.C. No.
3:07-cr-00330-
LAB-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRENT ROGER WILKES,
*Defendant-Appellant*.

No. 12-50257

D.C. No.
3:07-cr-00330-
LAB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
January 6, 2014—Pasadena, California

Filed March 10, 2014

Before: William A. Fletcher, Milan D. Smith, Jr.,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court in a case in which Brent Wilkes was convicted of wire fraud, bribery, conspiracy, and money laundering, in connection with his long-running scheme to bribe former Congressman Randall "Duke" Cunningham.

The panel held that the district court's failure to compel use immunity for a proposed defense witness, Michael Williams, did not violate Wilkes's right to a fair trial because Wilkes is unable to identify a direct contradiction between the testimony Williams would have offered at trial and testimony offered by an immunized government witness.

The panel rejected Wilkes's contention that determination of the amount of his criminal forfeiture by the district judge, as opposed to a jury, violated his Sixth Amendment right to a jury trial.

The panel held that the district court did not err in denying Wilkes's motion for a new trial based on "newly

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

discovered" evidence – declarations from Cunningham stating that Wilkes is innocent and court documents relating to a fraud scheme run by a co-conspirator in the bribery scheme. The panel stated that it is clear that the new evidence would not "probably result in acquittal."

## COUNSEL

Shereen Joy Charlick (argued), Assistant Federal Public Defender, San Diego, California, for Defendant-Appellant.

Phillip Lawrence Halpern (argued), Valerie Hsieh Chu, and Bruce R. Castetter, Assistant United States Attorneys, San Diego, California, for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

On November 5, 2007, a jury convicted Brent Wilkes on thirteen charges, including wire fraud, bribery, conspiracy, and money laundering, in connection with his long-running scheme to bribe former Congressman Randall "Duke" Cunningham. Wilkes was sentenced to 144 months in prison and ordered to pay a $636,116 criminal forfeiture or a $500,000 fine. Following our remand in *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) (*Wilkes I*), Wilkes raises three issues in this appeal.

Wilkes first argues that his right to a fair trial was violated under *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008)—which permitted a defendant to prove a Fifth and

Sixth Amendment violation by showing that "the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial." *Straub*, 538 F.3d at 1162. Wilkes further argues that the district court violated his Sixth Amendment right to a jury trial because the amount of his criminal forfeiture was not determined by a jury. Finally, Wilkes argues that the district court erred in denying his motion for a new trial. These arguments are unavailing, and we affirm the district court.

## FACTS AND PRIOR PROCEEDINGS

Wilkes created Automated Data Conversion Systems (ADCS)—named after an eponymous Department of Defense (DoD) program proposed by Wilkes—in order to pursue valuable defense contracts. Wilkes obtained and retained these contracts by virtue of his close ties to Congressman Cunningham. The details of Wilkes's scheme are described in *Wilkes I*, 662 F.3d 530–31.

At trial, the government introduced the testimony of 29 witnesses, who testified to a significant number of bribes paid by Wilkes to Cunningham. In addition to presenting evidence of Wilkes's payments to Cunningham, the government introduced evidence that ADCS failed to perform work required by the DoD contracts it had acquired, and that work performed by ADCS was of poor quality. In support of the latter proposition, the government introduced testimony from Wilkes's nephew, Joel Combs. The government also introduced testimony from Michael Wade, a consultant hired

by Wilkes to help ADCS obtain government contracts. Wade and Combs both testified about ADCS's work scanning documents in Panama (the Panama Project), as well as testifying more generally about Wilkes's scheme. Because Combs intended to invoke his Fifth Amendment privilege against self-incrimination at trial, the government granted him use immunity. The government had also entered into a favorable plea agreement with Wade in return for his testimony against his co-conspirators. Wilkes then requested use immunity for his witness, Michael Williams, who he contended would offer testimony that directly contradicted the testimony of Combs and Wade. The district court denied Wilkes's request based on its conclusion that it could not compel the granting of immunity to a defense witness absent a finding of prosecutorial misconduct.

On November 5, 2007, after four days of deliberation, the jury found Wilkes guilty on thirteen counts: one count of conspiracy, ten counts of honest services wire fraud, one count of bribery of a public official, and one count of money laundering. After the district court discharged the jury, it imposed criminal forfeiture against Wilkes in the amount of $636,116, or, in the alternative, a fine in the sum of $500,000.

Wilkes appealed his conviction, alleging, *inter alia*, that his Fifth and Sixth Amendment rights had been violated by the district court's failure to compel immunity for Williams, and that his Sixth Amendment rights had been violated because the district judge, rather than the jury, determined the amount of his criminal forfeiture. While his case was on appeal, we decided *Straub*, which clarified that a defendant could be entitled to compelled immunity for a defense witness in situations where that witness would directly contradict an immunized government witness's testimony,

and where the failure of the defense witness to testify deprived a defendant of his right to a fair trial. *Straub*, 538 F.3d at 1162. We remanded Wilkes's case to the district court with instructions that it determine whether Wilkes was entitled to compelled immunity for Williams; we rejected all of Wilkes's other claims.

On remand, the district court held an evidentiary hearing, during which Williams proffered the testimony that he would have given at Wilkes's trial had he been granted immunity. The district court concluded that Williams's testimony did not directly contradict that of an immunized government witness. The district court also concluded that Williams's failure to testify did not amount to a due process violation because he had no knowledge of the bribes paid to Cunningham, had no personal knowledge related to the charged offenses, and most of the conduct charged in the indictment occurred before Williams joined ADCS.

Wilkes also filed a motion for a new trial on the basis of "new evidence," consisting of declarations obtained from Cunningham corroborating Wilkes's testimony that he had not bribed the congressman, and court records supposedly corroborating Wilkes's testimony that money allegedly given to Cunningham as a bribe had instead been lost in a fraud scheme. The district court rejected the motion because the "new" evidence was available to Wilkes at the time of trial and "[did] not in any way establish a probability of acquitting him."

Wilkes now appeals both those rulings, and he renews his Sixth Amendment challenge to the district court's imposition of a criminal forfeiture.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction over this consolidated appeal pursuant to 28 U.S.C. § 1291. The question of whether a district court erred by refusing to compel use immunity is a mixed question of law and fact that we review de novo. *United States v. Alvarez*, 358 F.3d 1194, 1216 (9th Cir. 2004). Factual findings underlying the district court's ruling are reviewed for clear error. *Id.*

**DISCUSSION**

Wilkes raises three issues in this appeal. First, he argues that the district court erred in concluding that Williams was not entitled to compelled use immunity. Second, Wilkes argues that he has a Sixth Amendment right to have the amount of his criminal forfeiture decided by a jury. Finally, Wilkes argues that newly discovered evidence should compel us to grant him a new trial. We disagree, and affirm the district court.

**I.   Compelled Immunity**

Wilkes contends that the district court's failure to compel use immunity for Williams violated his right to a fair trial under *Straub*. In support of this argument, Wilkes points to eight alleged contradictions between Williams's proffered testimony and testimony offered by Combs, who was granted use immunity, and Wade, who received a favorable plea agreement from the government. The record, however, makes clear that Williams never directly contradicts testimony offered by Combs or Wade.

## A. Legal Standard for Compelled Immunity

In *Straub*, we held that a defendant could establish a Fifth and Sixth Amendment violation by showing that: "(1) the defense witness's testimony was relevant; and (2) either (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial."[1] *Straub*, 538 F.3d at 1162. *Straub* also recognized that "[a] survey of our opinions suggests that in the majority of cases where a defendant seeks to compel immunity for a witness, that witness's testimony will not be 'directly contradictory' to that of the prosecution's witness, or there will have been no distortion of the fact-finding process, and the district court may deny immunity on those bases." *Id.* at 1161.

---

[1] Our cases make clear that government witnesses who are granted favorable plea deals in return for their testimony are encompassed by *Straub*'s use of the term "immunized." *See United States v. Young*, 86 F.3d 944, 948 (9th Cir. 1996) ("Of the remaining four witnesses who testified against Young, two . . . had entered into plea agreements with the government, and two . . . received immunity. In light of these plea agreements and grants of immunity, there is a serious danger that the government's denial of immunity to Delfs—the only witness who could have impeached Drake as the government's critical witness—distorted the fact-finding process.").

We have found direct contradictions where witnesses offer differing accounts of factual circumstances. For example, in *Straub*, immunized government witness Adams admitted that, if asked, he would deny that he had walked into a bar in 2003 and confessed to Mike Baumann that he had "just shot a guy." *Straub*, 538 F.3d at 1162. The defense sought to compel immunity for Baumann, who was prepared to testify that Adams, the key prosecution witness, had arguably confessed to the very crime attributed to Straub. *Id.* at 1162–63.

Similarly, in *United States v. Young*, the government offered testimony from John Drake to the effect that two defendants, Tamez and Young, used Drake as a middleman to distribute cocaine. 86 F.3d at 946. Tamez and Young sought immunity for David Delfs, who was prepared to testify that he had heard government witness Drake state that he was "falsely accusing somebody as being [his] supplier in the Tri-Cities." *Id.* at 947. Delf's testimony—that Drake said either Tamez or Young was falsely accused—directly contradicted Drake's own testimony—that Tamez and Young both supplied him with cocaine. Accordingly, we remanded the case to the district court for the purpose of determining whether the failure to grant immunity had intentionally distorted the fact-finding process. *Id.* at 949; *see also Benjamin v. Prosper*, No. 2:03–cv–1166, 2010 WL 4630252 at *12–14 (E.D. Cal. 2010) (noting that proffered witness who would testify that she had stolen Sudafed directly contradicted police offer's statement that the defendant had stolen the drugs).

By contrast, in *United States v. Alvarez* we held that failure to immunize a defense witness was appropriate where that witness "had been to several 'stash' house locations and

would have testified that [the defendant's] home was not one of those she visited." 358 F.3d at 1216. We held that "this does not directly contradict the testimony of the government's witnesses that [the defendant's] house was in fact used to store cocaine in 1996. In fact, [the defense witness] was not present during any of the shipments of cocaine to various 'stash' houses, so she was not in a position to directly contradict the government's witnesses' testimony that implicated [the defendant] in the scheme." *Id.*

Our cases thus illustrate what Aristotle expressed more than two-thousand years ago—that "contradictory propositions are not true simultaneously." Aristotle, *Metaphysics, Book IV* 1011b13–14. Thus, a witness directly contradicts another witness if their respective testimonies cannot simultaneously be true, although in this context the proffered defense testimony "need only support (as opposed to compel) a finding by the jury that it was 'directly contradictory.'" *Straub*, 538 F.3d at 1163. We next turn to the question of whether Williams's testimony directly contradicts testimony given by either Combs or Wade.

## B. Combs's Testimony

Wilkes alleges that Williams's proffered testimony would have directly contradicted immunized government witness Combs's testimony in six respects: (1) the level of demand for Wilkes's VP-Max Software; (2) the identity of the Panama Project Manager; (3) whether ADCS had billed the government for equipment that it had not purchased; (4) whether ADCS had billed for work that it had not completed; (5) the reason that Wilkes opposed bar-coding the equipment used in Panama; and (6) whether ADCS had billed the government for a useless "ROI Task Plan."

### 1.  Demand for VP-Max Software

When Combs started at ADCS in late 1995, he was tasked with selling document-scanning software (VP-Max) to the DoD.  ADCS hoped to sell more copies of the software.  However, after an initial software purchase, the DoD declined to purchase any more copies of VP-Max.  Combs testified that Wilkes sent him to "creat[e] a demand amongst the military to buy the software" but that he did not discover much demand for the product and was unable to generate any additional sales.  Combs further testified that Wilkes showed him a letter—written by Wilkes and signed by Cunningham—aimed at pressuring the DoD to purchase more VP-Max software.  After Cunningham's involvement, the DoD purchased more software.

At the evidentiary hearing conducted by the district court for the purpose of ascertaining the contents of Williams's potential testimony, Williams testified he was "familiar" with VP-Max, that he thought it was a worthwhile product, and that "there seemed to be" demand for the product.  These general impressions about VP-Max's merits do not directly contradict Combs's testimony about his specific experiences selling VP-Max—both statements can simultaneously be true.

### 2.  Identity of the Project Manager in Panama

In 1998, ADCS secured a contract to scan documents in Panama.  Wilkes put his nephew Combs in charge of the project, despite the fact that Wilkes thought he was a "ball dropper."  At Wilkes's trial, Combs testified that he was the manager of the Panama Project on October 27, 1998.  Combs also testified on cross-examination that he was the project

manager before Williams was hired, and that he believed that Williams had been hired in November of "1998, 1999."

Williams testified that he was hired in September of 1998, and that he became the manager of the Panama Project "relatively soon after" that, a time period of "a couple of months." Williams again does not directly contradict Combs, who noted that Williams took over the Panama Project sometime in November of 1998.

### 3. Equipment for the Panama Project

On October 27, 1998, ADCS submitted a $3 million invoice for equipment purchased in connection with the Panama Project. Combs testified that ADCS had not actually purchased any of the equipment listed on the invoice at the time it was submitted.

Williams testified that "most of the equipment that was used [in Panama] was . . . there when [he] arrived." He further testified that "subsequent to the equipment being there, [he] did an analysis on the invoices and the purchases of [that] equipment. And I did know, from that, that [Wilkes] did purchase it." Finally, in response to the question of whether ADCS had ever invoiced the government for equipment it never purchased, Williams responded, "not to my knowledge."

None of this testimony contradicts what Combs actually said. Combs testified that the equipment listed on the October 27, 1998 invoice had not been purchased at the time ADCS submitted an invoice seeking payment for purchasing that equipment. By contrast, Williams stated after he had taken over the project, some time later he reviewed invoices

and determined that Wilkes had purchased the equipment being used in the Panama project. It is entirely possible that the equipment was purchased between the time that ADCS submitted the invoice that Combs identified as false and the time that Williams observed that the equipment had been purchased.

### 4. Billing for Nonexistent Work

ADCS also submitted two invoices for services rendered on the Panama Project on October 27 and 28, 1998. Combs testified that ADCS had not actually completed the tasks reflected in the invoices at the time they were submitted. By contrast, Williams testified that "to the best of [his] knowledge" ADCS did not bill the government for work that it did not do, but admitted that "[he] didn't always see the invoices that were submitted."

Combs's testimony states that two invoices, submitted in late October 1998, billed the government for work that was not completed. Williams does not state that those two invoices accurately reflected work that ADCS had completed, nor is it clear that he could have done so, as he was not involved in the Panama Project at the time. Further, Williams's testimony that he did not recall any fraudulent invoices being submitted does not contradict Combs, because Williams admitted that he did not see all of the invoices.

### 5. Bar-coding Dispute

Combs testified that the government wanted to place bar-codes on equipment used in the Panama Project for identification, but that Wilkes told Combs that he did not want the equipment labeled because "[h]e wanted to be able

to move it to other projects or anywhere," and bar-coding would identify the equipment as belonging to the government. Combs further testified that the government had paid for the equipment, but that Wilkes had moved the equipment to other locations.

Williams testified that the bar-coding problem was "that if the equipment belonged to ADCS and not the government, then by the government applying bar-codes to that equipment it would imply their ownership." Williams further testified that it "was [his] understanding" that at the time the bar-coding dispute arose the government had not paid for the equipment. Finally, Williams testified that he and Wilkes had not talked about opposing bar-coding because ADCS was trying to steal the equipment.

Combs testified about a private conversation that he had had with Wilkes. Even if Wilkes gave Williams other reasons for not bar-coding the equipment, that does not contradict Combs's testimony about the meeting. Furthermore, Williams only states that "it was his understanding" that the equipment was owned by ADCS. Clearly he could have held that understanding concurrently with the events described in Combs's testimony.

### 6. ROI Analysis

On September 30, 1998, ADCS submitted a $135,795 invoice for an "ROI." An "ROI Task Plan" was attached to the invoice. Combs testified that he prepared the task plan, but that he had no experience doing so. Combs also testified that the document was incomplete, and that when he submitted the document to the government "[t]here was immediate push-back" because the document was useless.

Williams testified that ADCS was responsible for preparing an ROI report, and that ADCS had subcontracted that work to PricewaterhouseCoopers. He further testified that "to the extent that it was completed and delivered, [he] believed that [it was of value to the government]." Williams also admitted that he had never seen the "ROI Task Plan" appended to the September 30 invoice, and that it was not the document he prepared with PricewaterhouseCoopers.

Williams and Combs appear to be referencing completely different documents. The document that Combs worked on, and which he describes as useless, titled "ROI Task Plan," is appended to the September 30 invoice. Williams admits to never having seen that document, nor did he have any involvement with the Panama Project at that point. Williams's testimony at most indicates that ADCS later completed a full ROI analysis, but does nothing to dispute Combs's contention that the September 1998 invoice sought payment for poor-quality work.

## C.  Wade's Testimony

Wilkes argues that Williams's testimony would have contradicted Wade's testimony in two respects: (1) whether DoD officials' concerns about ADCS's performance on the Panama Project were "justified," and (2) whether ADCS planned a "change in focus" involving hardware sales. As with Combs's testimony, Williams's testimony does not directly contradict Wade's.

### 1. DoD Officials' Concerns about Wilkes's Work in Panama

Wade testified that Gary Jones and Paul Behrens, two officials with the DoD, expressed concerns over "pricing and performance," including issues surrounding the inventory of equipment. Wade further testified that those concerns were "justified," and that he and Wilkes had met to discuss their response. Wade noted that the plan was to meet the officials, and if Wilkes and Wade did not allay their suspicions, to involve Cunningham. Wade also testified that Bob Fromm, a different DoD official, expressed concerns, and that they were "justified."

Williams testified that government concerns that Wilkes was blocking the bar-coding effort to steal the equipment were not "justified." He also testified that concerns about ADCS billing for work that it did not do were not "justified." These statements do not directly contradict Wade's testimony in the manner contemplated by *Straub*. Wade's statement that the concerns were "justified" is a matter of opinion. Two parties can truthfully hold differing opinions at the same time. Accordingly, Williams's testimony does not amount to a direct contradiction.

### 2. Whether ADCS Planned a "Change in Focus"

Wade also testified that he and Wilkes discussed a "change in focus" from "scanning to buying hardware and software." Wade further testified that he and Wilkes would mark up, sometimes by 600 percent, the cost of the equipment sold to the government, which was more lucrative than providing scanning services.

Williams testified that he did not believe ADCS was only awarded a hardware contract due to a "change in focus." But this does not directly contradict Wade's testimony regarding a specific conversation between Wade and Wilkes. Williams merely notes that, as far as he was aware, one specific contract awarded to ADCS for hardware was not awarded "because ADCS decided to have a shift in focus."

Wilkes thus fails the first prong of the *Straub* test. He is unable to identify a single direct contradiction between the testimony Williams would have offered at trial and testimony offered by an immunized government witness. Accordingly, the district court's conclusion that failure to compel use immunity for Williams did not violate Wilkes's right to a fair trial is correct. *Straub*, 538 F.3d at 1162.

## II. Forfeiture

Wilkes argues that determination of the amount of his criminal forfeiture by the district judge, as opposed to a jury, violated his Sixth Amendment right to a jury trial. Wilkes argues that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), require that the jury find facts justifying an increase in either end of the range of the prescribed penalty. Wilkes further argues that *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), applied *Apprendi* and, by extension, *Alleyne*, to monetary penalties—which he contends includes criminal forfeiture.

Wilkes's argument is directly contradicted by binding Supreme Court precedent. In *Libretti v. United States*, 516 U.S. 29, 48–49 (1995), the Court expressly held that there is no Sixth Amendment right to a jury verdict in a criminal forfeiture proceeding. The Supreme Court has

cautioned courts of appeals against concluding that "recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Thus, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). In compliance with the Supreme Court's instructions, we reject the argument that *Southern Union* implicitly overruled *Libretti*.

## III.    New Trial

Finally, Wilkes moved for a new trial in the district court based on "newly discovered" evidence—declarations from Cunningham stating that Wilkes is innocent and court documents relating to a fraud scheme run by Tommy Kontogiannis, a co-conspirator in the bribery scheme. The district court denied the motion, noting that "[t]he evidence [Wilkes] brings to bear — Cunningham's declarations and proof of the Kontogiannis fraud — was available to him at the time of trial, and, in any event, the Court is extremely confident that it does not in any way establish a probability of acquitting him." We agree.

In order to obtain a new trial based on newly discovered evidence, Wilkes must establish that: (1) the evidence is newly discovered; (2) his failure to discover the evidence sooner was not the result of a lack of diligence; (3) the evidence is material; (4) the evidence is neither cumulative nor merely impeaching; and (5) the evidence indicates a new

trial would probably result in acquittal. *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005).

We need not address the first four prongs, because it is clear that the new evidence would not "probably result in acquittal." *Id.* at 601. In *Wilkes I*, we noted that "[t]his was not a close case . . . . While Combs's testimony may have significantly helped the government's case, prosecutors also presented over two-dozen other witnesses and extensive documentary evidence of Wilkes's guilt." *Wilkes I*, 662 F.3d at 541. Wilkes argues that declarations obtained from Cunningham—which state that Wilkes never bribed Cunningham—and court documents related to a mortgage fraud scheme run by Cunningham's associate Kontogiannis— which Wilkes argues show he lost money to the scheme rather than used Kontogiannis as a means to bribe Cunningham—would likely result in his acquittal, despite this mountain of evidence.

Self-serving declarations by a convicted criminal, however, are unlikely to persuade a jury, especially where those statements are directly contradicted by Cunningham's own sworn statements at his plea colloquy. The evidence of Kontogiannis's fraud scheme also would not likely have resulted in acquittal because there is no new evidence to support the argument that Wilkes paid Kontogiannis as part of that scheme, instead of as a bribe to Cunningham.

## CONCLUSION

For the foregoing reasons we **AFFIRM** the district court.